# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:25-cv-00582 Judge Aleta A. Trauger |
| JONATHAN SKRMETTI, in his official capacity as Attorney General of Tennessee, | ) ) ) ) | |
| Defendant. | ) ) | |

## <u>MEMORANDUM</u>

Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") filed a Complaint seeking declaratory and injunctive relief against Jonathan Skrmetti in his official capacity as the Attorney General of Tennessee (referred to herein as "Tennessee" or the "State"). (Compl., Doc. No. 1.) PhRMA, a trade association whose members manufacture and sell pharmaceutical products, "advocates for policies that encourage the discovery and development of important new pharmaceutical products." (*Id.* ¶¶ 29, 28.) PhRMA brings claims under 42 U.S.C. § 1983, asserting that the recently enacted Tennessee Hospital Act (the "Tennessee Act" or the "Act"), now codified at Tenn. Code Ann. § 47-18-136, violates the United States Constitution's Supremacy Clause, dormant Commerce Clause, and Due Process Clause. (Doc. No. 1 ¶ 1.) PhRMA seeks declaratory relief to that effect and asks the court to enjoin enforcement of the Act in its entirety. (*See id.* at 58.)

Now before the court are (1) PhRMA's Motion for Preliminary Injunction (Doc. No. 13); and (2) the State's Motion to Dismiss (Doc. No. 16). In addressing these motions, the court does

not write on a completely blank slate, having already addressed many of the same challenges to the same statute in two opinions in a related case. *See AbbVie Inc. v. Skrmetti* ("*AbbVie II*"), No. 3:25-cv-00519, 2026 WL 542712, at *4 (M.D. Tenn. Feb. 26, 2026) (granting the Attorney General's motion to dismiss constitutional challenges to the Act); *AbbVie Inc. v. Skrmetti* ("*AbbVie I*"), No. 3:25-cv-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (denying pharmaceutical company plaintiffs' motion for preliminary injunction to enjoin enforcement of the Act). Largely for the same reasons set forth in those opinions and as discussed herein, the court will grant the Motion to Dismiss and deny as moot the plaintiff's Motion for Preliminary Injunction.

## I.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

Without referencing which rule governs his motion, the defendant moves to dismiss based in part on the plaintiff's supposed lack of associational standing. (Doc. No. 16 at 13–16.) Generally, to survive a motion to dismiss on standing grounds, "a complaint must 'clearly . . . allege facts demonstrating' standing." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 543 (6th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *see also id.* (holding that the "plausibility" test established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), applies to a motion to dismiss on standing grounds). Accordingly, accepting as true the Complaint's factual allegations, the court must determine whether the plaintiff "asserts a 'plausible claim' that one of its members has standing." *Ass'n of Am. Physicians*, 13 F.4th at 544 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint states a plausible claim when it states "enough facts to raise a reasonable expectation that discovery will reveal evidence" that a plaintiff has standing. *Twombly*, 550 U.S. at 545. Once a plaintiff has demonstrated standing, a court has jurisdiction to consider the ultimate

merits of the claims raised by that plaintiff. *Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977)).

A Rule 12(b)(1) motion can challenge lack of subject matter jurisdiction in two ways: a facial attack and a factual attack. *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007) (citation omitted). "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). When considering a facial challenge to standing, the court accepts as true the material allegations in the complaint and confines its analysis to the four corners of the complaint. *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 706 (6th Cir. 2015).

A factual attack, on the other hand, allows the court to consider evidence outside the pleadings and to "weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) (citations omitted). In addressing a factual attack, the court may look to amendments to the complaint, sworn declarations, and other materials in the record to decide whether the plaintiff has adequately demonstrated standing. *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Plunderbund Media, L.L.C. v. DeWine*, 753 F. App'x 362, 366 (6th Cir. 2018) (authorizing a review of declarations filed in support of a motion for preliminary injunction in ruling on a motion to dismiss).

The defendant addresses only the allegations in the Complaint in his Motion to Dismiss, thus implicitly making only a facial challenge. However, he raises the same associational standing arguments *and* references the plaintiff's Declarations in his Response in Opposition to the Motion for Preliminary Injunction, where he appears to make a factual attack on the court's subject matter jurisdiction. Under these circumstances, the court finds that it is in the interest of justice to look

beyond the Complaint and consider the plaintiff's Declarations to determine whether the plaintiff has standing. *See Warth*, 422 U.S. at 501 (explaining that "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing").

### B.     Rule 12(b)(6)

The defendant also seeks dismissal of the plaintiff's claims on the merits. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Background

PhRMA initiated this lawsuit on May 22, 2025, shortly before the effective date of the Act. It claims that the Act is preempted by federal law and is therefore barred by the U.S. Constitution's Supremacy Clause; impermissibly regulates out-of-state conduct in violation of the dormant Commerce Clause; and is unconstitutionally vague under the Due Process Clause. The underlying

federal law at issue, Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical companies that want to participate in Medicaid and Medicare Part B to offer steep discounts on certain outpatient drugs to "covered entities," a term defined to include public hospitals and community health centers and other entities typically engaged in "car[ing] for low-income and rural persons." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023); *see also* 42 U.S.C. § 256b(a)(4) (defining "covered entity"). (*See also* Compl., Doc. No. 1 ¶ 40.) This program, referred to as the "340B program," helps covered entities provide "safety-net services to the poor," *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011), because the entities "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount," *Sanofi Aventis*, 58 F.4th at 699. The 340B program is administered by the Secretary of Health and Human Services ("HHS") and "superintended by the Health Resources and Services Administration" ("HRSA"), which is an HHS agency. *Astra USA*, 563 U.S. at 113.

Generally, under the 340B program, "[c]overed entities may only prescribe 340B discounted drugs to patients who qualify and may not request or receive duplicative 340B discounts and Medicaid rebates for the same drug." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1141–42 (8th Cir.) (citing 42 U.S.C. § 256b(a)(5)(A)–(B)), *pet. for rehearing en banc and by panel denied*, No. 22-3675, 2024 WL 1919676 (8th Cir. May 2, 2024), *cert. denied*, 145 S. Ct. 768 (2024). "Additionally, covered entities may not engage in diversion of covered outpatient drugs through 'resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity.'" *Id.* at 1142 (quoting 42 U.S.C. § 256b(a)(5)(B)).

The 340B statute authorizes HHS and drug manufacturers to audit covered entities to ensure compliance with the diversion and duplicate rebate prohibitions, "in accordance with

procedures established by the Secretary relating to the number, duration, and scope of audits." *Id.* (quoting 42 U.S.C. § 256b(a)(5)(C)). The program contains enforcement mechanisms and penalties for manufacturers and covered entities that fail to comply with those provisions. *Id.* (citing *Sanofi Aventis*, 58 F.4th at 700). Any disputes arising under the 340B program must first be submitted to HHS's dispute resolution program. *Id.* (citing 42 U.S.C. § 256b(d)(3)).

Although the 340B program was apparently designed with the expectation that it would apply to covered entities that operated in-house pharmacies, "[s]ince the beginning, covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs." *Id.* at 1139. "Indeed, early in the 340B Program, HRSA observed that most covered entities relied on contract pharmacies, while only about four percent of such entities used in-house pharmacies." *Id.* at 1142 (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance")).

Purportedly worried that the proliferation of contract pharmacies was "driving up duplicate discounting and diversion," in 2020, drug makers began adopting policies that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457 (D.C. Cir. 2024); *see also McClain*, 95 F.4th at 1139. When this conduct was challenged by the federal government, manufacturers responded by arguing that the federal law addressed only the pricing structure of 340B drugs but was silent about their *delivery*, leaving manufacturers free to negotiate their contracts with 340B covered entities to address that gap. And the federal courts agreed. *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 703, 706–07 (3d Cir. 2023) (holding that the "text [of § 340B] is silent about delivery" and rejecting HHS's "reading of Section

340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies," because "[l]egal duties do not spring from silence"); *see also Johnson*, 102 F.4th at 461 ("agree[ing] entirely" with the Third Circuit's conclusion that, "because section 340B is 'silent about delivery,' HRSA erred in concluding that the statute '*requires* drug makers to deliver drugs to an unlimited number of contract pharmacies'" (emphasis added) (quoting *Sanofi Aventis*, 58 F.3d at 703)).

In the wake of these rulings, Tennessee—along with approximately twenty other states (so far)—attempted to fill that "silence" by passing a law that prohibits pharmaceutical companies from limiting the number of contract pharmacies with which covered entities can enter agreements pertaining to the delivery of 340B drugs or otherwise imposing distribution obstacles not required by the federal program. As relevant here, under Tennessee's Hospital Protection Act, as of July 1, 2025, drug manufacturers and their agents and affiliates "shall not":

> (1) Impose additional requirements or limitations on a 340B entity, including requiring the submission of any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless such data submission is explicitly required by the United States department of health and human services or applicable state law;
>
> (2) Require a 340B entity to reverse, resubmit, or clarify a claim after the initial adjudication unless these actions are in the normal course of business and not related to the 340B program;
>
> (3) Impose any requirements relating to inventory management systems of 340B drugs, unless such requirement is required by the United States department of health and human services or applicable state law;
>
> (4) Impose any requirement relating to the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities;
>
> (5) Impose requirements relating to accreditation, recertification, credentialing, or recredentialing that are not imposed on pharmacies or providers that are not 340B entities; or

(6) Impose any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program.

Tenn. Code Ann. § 47-18-136(a). Generally, in other words, the Act bars pharmaceutical companies from imposing requirements on covered entities in addition to those requirements expressly set out in § 340B or from discriminating against covered entities by imposing upon them requirements that they do not impose on providers that are not 340B entities.

In addition, the Act prohibits drug manufacturers from

deny[ing], impos[ing] any restrictions or prohibitions on, discriminat[ing] against, or otherwise limit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity or other location that is under contract with, or otherwise authorized by, a 340B entity to receive 340B drugs on behalf of the 340B entity unless such receipt is prohibited by the United States department of health and human services or applicable state law.

Id. § 47-18-136(c). Subsection (c), however, also contains a "grandfather clause," which provides that it "does not apply to any requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025." *Id.*

The Act also provides that each violation of subsection (a) or (c)[1] constitutes an "unfair or deceptive act or practice affecting trade or commerce" and, as such, a violation of the Tennessee Consumer Protection Act ("TCPA"), for which a civil penalty of $50,000 per violation may be assessed. *Id.* § 47-18-136(d)(1); *see also* Tenn. Code Ann. § 47-18-104(b)(69) (identifying the violation of § 47-18-136 as an unfair or deceptive act or practice). The TCPA further states that unfair or deceptive acts or practices constitute Class B misdemeanors, authorizes civil enforcement by the Tennessee Attorney General, Tenn. Code Ann. § 47-18-114, and, in theory at least, permits

---

[1] Subsection (b) does not govern the activities of drug manufacturers and is not at issue in this lawsuit.

any "person who suffers an ascertainable loss of money or property" to bring a civil action to recover damages, Tenn. Code Ann. § 47-18-109(a)(1).

As this court has previously recognized, although the text of Tennessee's Act is not identical to that of analogous laws passed in other states, these laws share many features, "including prohibitions on certain manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies for violations of the prohibitions." *AbbVie II*, 2026 WL 542712, at *4 (quoting *Pharm. Rsch. & Mfrs. of Am. v. Frey*, No. 1:25-cv-00469-JCN, 2026 WL 184504, at *1 (D. Me. Jan. 23, 2026), *appeal filed* (Jan. 28, 2026)). Drug manufacturers have filed lawsuits in many of these states to enjoin the statutes' enforcement, but, to date, these lawsuits have met with very limited success. *See id.* at *4 & nn. 3–6 (collecting cases).

## B. The Plaintiff's Claims

PhRMA characterizes the Act as "Tennessee's attempt to rewrite the terms" of the 340B program, and it characterizes its lawsuit as "an effort to protect the integrity and viability of 340B by honoring the bounds Congress set on the program. (Compl. ¶¶ 2, 6.) According to PhRMA, "concerns about diversion and illegal 'duplicate discounts' in the 340B program have skyrocketed" in the last ten years, as covered entities and contract pharmacies have adopted the "product replenishment model," pursuant to which "contract pharmacies first order drugs at market prices, and then, following sale of those drugs, seek to replenish their inventories with 340B-priced drugs by retroactively identifying, via black-box algorithms, drugs that are purportedly eligible for 340B pricing." (*Id.* ¶ 7.) As a result of the widespread adoption of this model, "the volume of drugs purchased at reduced 340B pricing has exploded," though the associated price reductions are not passed on to low-income patients. (*Id.* ¶ 8.)

Although the federal government has "warned about the risks of abuse created by the use of contract pharmacies and the product replenishment model," it has done little to curb these

abuses, as a result of which pharmaceutical manufacturers have adopted their own policies to address them and have incorporated these policies into their contracts with 340B covered entities. These policies typically (1) limit the number of outside "contract pharmacies" with which a covered entity may contract to receive 340B-priced drugs (the "one contract pharmacy" policy), and (2) require that contract pharmacies submit data supporting their claims for the 340B-priced drugs (the "claims data" policy). (*Id.* ¶ 9.) Tennessee's Act, like similar statutes enacted in other states, bars these precise policies. (*Id.* ¶ 13.)

As discussed in more detail below, the Complaint itself is devoid of allegations regarding the Act's effect on particular PhRMA members, but PhRMA submitted several Declarations in support of its Motion for Preliminary Injunction, including two on behalf of two different drug manufacturers that are PhRMA members, attesting that the cost of attempting to comply with the Act has imposed and continues to impose significant costs on the manufacturers. (Doc. No. 14-2, Costello Decl.; Doc. No. 14-3, Janco Decl.)

The plaintiff alleges that the Act constitutes "meddling in a purely federal program" by "chang[ing] the requirements of the federal 340B program and the conditions under which manufacturers are forced to provide their drugs at reduced prices," thus violating the Supremacy Clause. More specifically, PhRMA asserts that the Act forbids four specific actions that are "fully permissible" under federal law: (1) it "explicitly limit[s] manufacturers' federal audit rights" (*id.* ¶ 17 (citing Tenn. Code Ann. § 47-18-136(a)(1), (4))); (2) it bars manufacturers from "adopting alternative pricing mechanisms . . . that [would] provide greater transparency" than the replenishment model, and specifies that manufacturers cannot take actions to seek to clarify whether a particular claim is compliant with federal law (*id.* ¶ 18 (citing Tenn. Code Ann. § 47-18-136(a)(3), (2))); (3) it prohibits manufacturers from imposing any "credentialing" or other

requirements that might "interfere with the ability of a 340B entity to access discounts provided under the 340B program" (*id.* ¶ 19 (quoting. Tenn. Code Ann. § 47-18-136(a)(5), (6))); and (4) it "conflicts with the federal regime by forcing drug manufacturers to provide 340B-priced drugs to an *unlimited* number of contract pharmacies and locations, unless the manufacturer had preexisting limits or requirements in place before June 1, 2025" (*id.* ¶ 20 (citing Tenn. Code Ann. § 47-18-136(c))). PhRMA also asserts that the state law "impermissibly intrudes" on the federal enforcement regime by imposing draconian civil and even potential criminal penalties on manufacturers that do not comply with the state law, as well as a private right of action under the Tennessee Consumer Protection Act. (*Id.* ¶¶ 21–22, 117.) In addition, according to PhRMA, any state enforcement action would embroil the state adjudicator in resolving "multiple questions of federal law." (*Id.* ¶ 120.) Based on these allegations, PhRMA asserts that the statute is "both field and conflict preempted under the Supremacy Clause." (*Id.* ¶ 25; *see also id.* at 42–51 ("Claim I").)

Second, the plaintiff asserts that the Act is a "textbook dormant Commerce Clause violation" because it "applies to transactions between manufacturers and wholesalers/distributors" and "thus regulates wholly out-of-state transactions." (*Id.* ¶ 26; *see also id.* at 51–54 ("Claim II").)

Third, PhRMA alleges that the Act is unconstitutionally vague, which is of particular concern in this case because the "statute imposes criminal" penalties as well as civil penalties and implicates First Amendment interests. (*Id.* ¶¶ 160, 161.) The plaintiff specifically takes issue with § 47-18-136(a)(6), the "catch-all provision," because it purports to bar the imposition of "any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program" but does not define the term "interfere." (Doc. No. 1 ¶ 163.) It also contends that the "plain language" of the Act prohibits manufacturers from exercising their rights to "publicize information about unlawful transfers or

duplicate discounting occurring at particular contract pharmacies or covered entities, to audit covered entities and their records relating to contract pharmacies, to file complaints in the context of the federal system that Congress created, and to seek information regarding, and clarify claims from, covered entities and contract pharmacies." (*Id.* ¶ 164.) At the same time, it contends that "[u]ncertainty about the scope of prohibited conduct and speech—which [the Act] presents—is the precise problem with vague laws." (*Id.*)

Based on these allegations, the plaintiff seeks a judicial declaration that the Act in its entirety is unconstitutional and an order enjoining its enforcement as to PhRMA's members. (*Id.* at 58.) It filed its Motion for Preliminary Injunction, supporting Memorandum, and several Declarations shortly after it filed the Complaint. (Doc. Nos. 13, 14, 14-1 through 14-5.) The defendant filed his Motion to Dismiss (Doc. No. 16) on the same date. Both motions have now been fully briefed, each party having filed a Response to the other's motion and a Reply in further support of its own motion. (Doc. Nos. 30, 31, 33, 34.) In addition, the American Hospital Association, 340B Health, the Tennessee Hospital Association, and the American Society of Health-System Pharmacists ("Amici"), with the court's permission, filed a Brief of Amici Curiae (Doc. No. 27) both in support of the defendant's Motion to Dismiss and in opposition to the plaintiff's Motion for Preliminary Injunction (*see* Doc. No. 26).[2]

### III.     DISCUSSION

The State's motion raises a number of standing or standing-related threshold challenges to PhRMA's Complaint. It contends (1) that PhRMA cannot bring suit under 42 U.S.C. § 1983 because that statute "only allows plaintiffs 'to vindicate their *own* constitutional right[s],'" and

---

[2] Amici filed with their Brief the Declaration of Chantelle Britton (Doc. No. 27-1), which the court has not considered for purposes of ruling on the defendant's Motion to Dismiss.

PhRMA, a trade association, seeks to bring claims on behalf its members (Doc. No. 16 at 14 (quoting *Chambers v. Sanders*, 63 F.4th 1092, 1100 (6th Cir. 2023))); (2) similarly, that PhRMA is not entitled to bring suit under *Ex parte Young*, 209 U.S. 123 (1908), because *Ex parte Young* authorizes only suits that "request . . . personalized protection from a state officer's 'specified un[constitutional] actions,'" but PhRMA does not seek such personalized protection from "individualized harm" (*id.* at 14–15 (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021))); and (3) even if PhRMA can skirt those problems, that it lacks associational standing to assert pre-enforcement claims against the State, because it fails to allege with any particularity how any particular member's policies violate the Act or to plead facts showing that the Attorney General poses a "'certainly impending'" threat to any of PhRMA's members, particularly a threat of criminal enforcement, and thus lacks the "'concrete context' ordinarily 'afforded by an enforcement action'" (*id.* at 15 (first quoting *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 1178 (2025); and then quoting *Ammex, Inc. v. Cox*, 351 F.3d 697, 706–07 (6th Cir. 2003)).)

In the alternative, the State seeks dismissal of the Complaint under Rule 12(b)(6), arguing that the plaintiff's claims fail on the merits. Finally, the State argues that, to the extent the court is inclined to permit any of PhRMA's claims to proceed, it must reject the plaintiff's "request for a broad 'declar[ation]' of 'unconstitutional[ity]'" and must instead engage in a "provision-by-provision" assessment of the Act to determine what actions the State cannot take against PhRMA. (*Id.* at 29.)

## A. Associational Standing

The United States Constitution limits federal judicial jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. Based on this limitation, federal courts are "'without power to decide questions that cannot affect the rights of litigants in the case before them' and

have no power to issue advisory opinions." *Cooper v. Comm'r*, 502 F. App'x 472, 477 (6th Cir. 2012) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). "[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In short, only a litigant with "standing" is "entitled to have [a] court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish constitutional standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61). "In the context of claims for injunctive or declaratory relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized, and that threat must be actual and imminent, not conjectural or hypothetical[.]" *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 491 (6th Cir. 2017) (citation and internal quotation marks omitted).

In addition, however, the doctrine of "associational standing" "sometimes permits an entity to sue over injuries suffered by its members even when (as here) the entity itself alleges no personal injury." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) (citations omitted). In *Association of American Physicians*, the Sixth Circuit observed that recent Supreme Court opinions have called into question the continuing validity of associational standing when the association does not allege its own injury. *Id.* at 542. However, while the court concluded that "it is hard to see how the Supreme Court's more recent caselaw on standing has not undercut its associational-standing test," it also recognized that, in situations like

this one, "lower courts . . . must stick to [the Supreme Court's] directly on-point precedent even if the logic from other cases has called that precedent into doubt." *Id.* at 542 (citations omitted).[3] Accordingly, the court applied the Supreme Court's long-standing test and held that, under current law,

> [a]n organization may sue on behalf of its members if it shows that: (1) its "members would otherwise have standing to sue in their own right"; (2) the "interests" that the suit "seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Id.* at 537 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The State's first two standing arguments do not actually challenge or even address any of these elements of associational standing. Instead, the State simply asserts that suits against state officials under § 1983 and *Ex parte Young* may not be brought by plaintiffs asserting associational standing—a proposition supported by nothing other than quotations taken out of context in which the issue of associational standing was not raised. As the plaintiff points out, the Sixth Circuit has long allowed plaintiffs with associational standing to bring claims under § 1983 against state officials in their official capacity, under *Ex parte Young*. *See, e.g.*, *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031–42 (6th Cir. 2022) (finding that nonprofit organization had associational standing to bring § 1983 claim against state officials in their official capacity and that these claims fell within *Ex parte Young* exception to Eleventh Amendment

---

[3] Justice Thomas cited and relied extensively on *Association of American Physicians* in his concurrence in *Food and Drug Administration v. Alliance for Hippocratic Medicine*, arguing that the doctrine of "[a]ssociational standing raises constitutional concerns by relaxing both the injury and redressability requirements for Article III standing" and "upsets other legal doctrines," and urging the Court, in "an appropriate case," to "explain just how the Constitution permits associational standing." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring); *see id.* at 400–02 (quoting *Ass'n of Am. Surgeons*, 13 F.4th at 540, 541). To date, however, the Supreme Court does not appear to have retreated from its associational standing doctrine.

immunity); *see also Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016) (finding that nonprofit advocacy organization had associational standing to bring § 1983 claim against state official in his official capacity); *Westside Mothers v. Haveman*, 289 F.3d 852, 862 (6th Cir. 2002) (same). The State cites no authority to the contrary. Because this court is bound by Sixth Circuit and Supreme Court precedent authorizing plaintiffs asserting associational to bring § 1983 claims against state officials in their official capacity under *Ex parte Young*, the court rejects the defendant's first two arguments. The question, then, is whether the Complaint plausibly alleges facts that establish associational standing under the relevant standard.

### 1. Injury in Fact

As set forth above, to establish "injury in fact" in the pre-enforcement context, a plaintiff must show that it is "under threat of suffering 'injury in fact' that is concrete and particularized, and that threat must be actual and imminent, not conjectural or hypothetical." *Sumpter*, 868 F.3d at 491; *see also Crawford v. U.S. Dep't of the Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) ("Standing can derive from an imminent, rather than an actual, injury, but only when 'the threatened injury is real, immediate, and direct.'" (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). One way a plaintiff can satisfy the injury-in-fact requirement in relation to a newly enacted law with no enforcement history is by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [showing that] there exists a credible threat of prosecution thereunder." *Sumpter*, 868 F.3d at 491 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). In addition, however, "compliance costs are a recognized harm for purposes of Article III." *Kentucky v. Yellen*, 54 F.4th 325, 342 (6th Cir. 2022). As this court has explained, "[f]ollowing a law . . . can sometimes harm a person just as much as breaking it. That is why the caselaw recognizes that an injury-in-fact can arise not only out of expected enforcement but also 'costly, self-executing compliance burdens.'" *Tenn. State*

*Conf. of the N.A.A.C.P. v. Hargett*, 441 F. Supp. 3d 609, 626 (M.D. Tenn. 2019) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (finding standing because "plaintiffs . . . , if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution").

Applying the injury-in-fact requirement in the pre-enforcement context to an entity that seeks associational standing, the Sixth Circuit has explained that, for an organization to adequately plead the first element (that its members would have standing to sue in their own right), the organization must, at a minimum, "identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct." *Ass'n of Am. Physicians*, 13 F.4th at 543 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009)).

In PhRMA's Complaint, the allegations regarding standing are sparse. The plaintiff alleges very generally that its members have adopted "claims data policies and one contract policies" in existence prior to the effective date of the Act, but they now risk violating the Act if they modify their policies. (Doc. No. 1 ¶ 29.) The Complaint does not contain any allegations suggesting that any specific PhRMA member "inten[ds] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution," whether civil or criminal, under the Act. *Sumpter*, 868 F.3d at 491. Nor does it identify any PhRMA member that has incurred or will incur substantial costs in attempting to comply with the Act. However, in Declarations submitted in support of PhRMA's Motion for Preliminary Injunction, representatives of PhRMA members Amgen Inc. ("Amgen") and UCB, Inc. ("UCB") assert that compliance with the Act will "force[] [them] to provide millions of dollars in discounts" that are not required by the federal 340B program and, further, that "compliance with

[the Act] has and will continue to impose significant operational and financial burdens" on Amgen and UCB. (Doc. No. 14-2, Costello Decl. ¶¶ 18, 20; Doc. No. 14-3, Janco Decl. ¶¶ 17, 19; *see also id.* ¶ 20 ("UCB expects it will be required to continue to expend funds to ensure compliance with [the Act]. USCB would not otherwise be required to expend these funds . . . . In addition, UCB will continue re-allocating resources, diverting these resources from other efforts aimed at developing and introducing new medicines to benefit patients.").)[4] Amgen and UCB also allege that they will not be able to recoup these costs, even if a court declares the Act unconstitutional. (Costello Decl. ¶ 19; Janco Decl. ¶ 18.)

The court finds that the assertions in Costello's and Janco's Declarations are adequate to establish that at least two PhRMA members have suffered and expect to continue to suffer concrete and particularized injuries arising from implementation of the Act. Although the Complaint does not incorporate these facts, it would not be difficult for PhRMA to amend its pleading to do so.

> 2. *Other Standing Elements*

The defendant does not challenge the other elements of PhRMA's associational standing. The ordinary standing analysis requires a showing that the plaintiff's (or in this case, its members') injury was likely caused by the defendant and that judicial relief would redress the injury. Here, the Tennessee Attorney General is charged with enforcement of the Act; the purpose of the Act is specifically to prohibit the conduct in which PhRMA's members wish to engage; and a judicial

---

[4] Both entities also point to the "specter of criminal penalties" for failure to comply with the Act as "pos[ing] severe reputational risk." (Janco Decl. ¶ 21; *see also* Costello Decl. ¶ 22.) However, as this court already found in a related case, "in Tennessee, only District Attorneys— not the Tennessee Attorney General who is the only defendant in this case—can bring criminal charges," and, "while criminal charges under the TCPA are technically possible," they are highly unlikely. *AbbVie II*, 2026 WL 542712, at *8. The plaintiff's members' cannot establish that criminal enforcement of the Act is imminent or that the risk of it is sufficient to motivate compliance.

injunction barring its enforcement would alleviate PhRMA's members' concerns about the costs of complying with the Act or risking the costs associated with an enforcement action. It also seems clear from the record that the interests PhRMA seeks to protect are germane to its organizational purpose, and, because it seeks prospective relief only rather than money damages, participation of individual members in the lawsuit is not necessary. *Accord CTIA - The Wireless Ass'n v. Keats*, No. 21-5435, 2021 WL 7209356, at *3 (6th Cir. Dec. 3, 2021) (citing *United Food & Com. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996)).

Given that the record reflects facts establishing standing and that amendment of the pleading to allege those facts would be warranted in the interests of justice, the court will not dismiss for lack of subject matter jurisdiction but will proceed to consider the merits of the defendant's Motion to Dismiss under Rule 12(b)(6).

### B. Whether the Complaint States Colorable Claims for Relief

#### 1. The Supremacy Clause

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025) (quoting *Arizona v. United States*, 567 U.S. 387, 398 (2012)). On the other hand, the Supremacy Clause states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, when federal and state laws "'conflict or [are] at cross-purposes,' . . . the Supremacy Clause 'provides a clear rule' that federal law wins out." *Id.* (internal quotation marks omitted) (quoting Arizona, 567 U.S. at 399). When that happens, the federal law preempts the state law. *Id.*

The Supremacy Clause does not "include[] a private right of action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), but it is nonetheless well established that a plaintiff may seek "declaratory or injunctive relief against a state or local government that is presently taking or threatening action against the plaintiff pursuant [to] an allegedly preempted state law," *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 554 n.4 (6th Cir. 2012).

In this case, PhRMA asserts that the Act "attempts to regulate in an exclusively federal field," "directly conflicts with the federal statute," and "stands as an obstacle to the accomplishment and execution of the full purposes and objections" of the 340B program. (Compl. ¶¶ 25, 131; *see also id.* ¶¶ 124, 129; *see generally id.* ¶¶ 132–45.) That is, the plaintiff invokes both "field preemption" and "conflict preemption."

### a)      Field Preemption

"In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,'" courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (internal quotation marks and citations omitted). And the Supreme Court has expressly recognized the "historic primacy of state regulation of matters of health and safety." *Id.* Thus, this court begins the preemption analysis with the assumption that the state law at issue is not preempted.

Field preemption occurs only "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (citation omitted). Preemption is not to be "inferred merely from the comprehensive character" of a federal statute; rather, a statute preempts an entire field only if it

"reflect[s] a congressional decision to foreclose any state regulation in the area" and thus "confer[s] a federal right to be free from any other" requirements in the same field. *Id.* (citation omitted).

PhRMA's field-preemption theory rests on its assertions that the federal 340B program is a "comprehensive" scheme, the centralized control of which is vested exclusively with the HHS. (*See* Compl. ¶ 127.) It contends that Congress "designed a pervasive and integrated scheme of regulation through creation of a closed and limited system," by "carefully defin[ing]" the covered entities eligible to receive drugs at the 340B price, the "nature of the benefit," and "limitations on that benefit," and by "set[ting] out an exclusive federal enforcement scheme to maintain the federal programs as a harmonious whole." (*Id.* ¶ 128.) Its Response to the Motion to Dismiss contains one cursory paragraph arguing very generally that the need for "uniform standards, centralized enforcement, and balancing vital federal interests" show that field preemption applies in this case.

As discussed above, several federal appellate courts have held that the 340B statute is "silent about delivery conditions." *Johnson*, 102 F.4th at 460; *Sanofi Aventis*, 58 F.3d at 703. And for precisely that reason, the Fifth and Eighth Circuits have concluded that the 340B statute is not comprehensive and have rejected field preemption challenges to state statutes substantially similar to the Act. *See AbbVie, Inc. v. Murrill*, 166 F.4th 528, 540 (5th Cir. 2026) (finding that Louisiana's analogous statute was not field preempted); *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 647 (5th Cir. 2025) (finding that Mississippi's statute was not field preempted); *McClain*, 95 F.4th at 1143 [8th Cir.] (finding that Arkansas's statute was not preempted).

This court agrees and adopts in full the Fifth Circuit's reasoning, which applies equally in this case:

> Here, there is no federal framework so pervasive that Congress left no room for
> state supplementation. Section 340B is a drug pricing program that imposes ceilings
> on prices drug manufacturers may charge for medications sold to specified health-
> care facilities, with the intent of supporting services for low-income and rural

communities. Section 340B explicitly regulates several key matters: it caps the prices of covered drugs, 42 U.S.C. § 256b(a)(1), (a)(10); controls eligibility for "covered entity" status, *id.* § 256b(a)(4); prohibits covered entities from claiming duplicate discounts and engaging in diversion, *id.* § 256b(a)(5)(A)–(B); enforces compliance with its caps and bars, *id.* § 256b(a)(5)(D), (d)(1)-(3); and governs distribution of discounted drugs to covered entities by manufacturers and third-party wholesalers, *id.* § 256b(a)(8).

But Section 340B does not provide a full set of standards governing discounted drugs for needy patients. Notably, it regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution. As the Third Circuit has pointed out, Congress "knew how to impose delivery-related requirements" and regulate distribution, because Section 340B does authorize distribution of drugs by manufacturers and third-party wholesalers. *Sanofi Aventis*, 58 F.4th at 704. But Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, "matters left unaddressed" in an otherwise "comprehensive and detailed" federal regulatory scheme "are presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994).

Next, there is no dominant federal interest in the area regulated by [the Mississippi statute]. [That statute] [like Tennessee's Act] implicates two traditional general areas of state regulation and police power: public health and consumer protection. Although there are instances in which the Supreme Court has held that federal law preempts state law even if the state law exercises a traditional state power, that is usually in cases in which a principal and essential feature of the federal law is replicated in the state law, indicating that it is a fundamental area of federal regulation.

But . . . courts should not infer field preemption in areas that have been traditionally occupied by the states, in which case congressional intent to preempt must be clear and manifest. Here, Congress has expressed no clear and manifest intent to preempt state laws regulating the distribution of drugs to patients and the role of pharmacies in such distribution.

*Fitch*, 152 F.4th at 646–47 (most internal quotation marks, brackets, and citations omitted).

Like the Fifth and Eighth Circuits, this court applies the presumption against field preemption and concludes that Tennessee's Act is not field preempted.

> b)      *Conflict Preemption*

Conflict preemption applies if a state law "directly conflict[s]" with federal law—that is, "when compliance with both is impossible, or when . . . state law 'stand[s] as an obstacle to the

accomplishment' of Congress's objectives." *Churchill Downs*, 162 F.4th at 638 (first quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011); and then quoting *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020)). In other words, conflict preemption exists if a party cannot simultaneously comply with both state and federal law and, alternatively, when the state law interferes with Congress's objectives. This is a "high threshold." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011).

In a scattershot approach, the plaintiff offers up a variety of ways in which it contends that the state law conflicts with the federal law, none of which is persuasive on closer review. First, PhRMA contends that the Act's prohibition on imposing precisely the type of (delivery) conditions that the courts in *Johnson* and *Sanofi Aventis* held were permissible under the federal law constitutes an "attempt" by the State to "hijack the federal requirement to offer drugs at 340B prices and apply it in circumstances where, as [*Johnson*] explains, federal law would not." (Doc. No. 31 at 19; *see also id.* ("[The Act] bars conditions that have explicitly been upheld by federal appellate courts as permissible components of a 340B offer, such as contract pharmacy limitations and claim data policies.").) PhRMA also contends that the Act is not solely about drug "delivery,"

> [b]ecause there is no purchase of 340B-priced drugs if a buyer does not accept a manufacturer's conditions, there is no federal 340B purchase to which Tennessee can attach any state law delivery requirement. In other words, Tennessee law cannot compel delivery of a drug that has never been purchased. [The Act] would accordingly have no effect if it truly sought to regulate only drug "delivery." [*Johnson*], 102 F.4th at 462-64. There are only two genuine possibilities here: Either [the Act] regulates the content of a federal offer to compel a 340B-priced transaction when federal law does not (triggering preemption), or [the Act] simply does not apply.

(*Id.* at 20.)

But *Johnson* and *Sanofi Aventis* confirmed that the federal program says nothing about the types of conditions the drug manufacturers seek to impose, and, therefore, the State's efforts to regulate in that arena do not conflict either with 340B or with *Johnson* and *Sanofi Aventis*.

Moreover, as the State explains, the Act only alters Tennessee law as it pertains to completed sales of 340B drugs. The Tennessee law says nothing about pricing, and the federal law dictates only the price terms and the identification of what entities qualify as covered entities. Because federal law does not address non-price terms for drug sales to 340B hospitals, Tennessee remains free to do so. *Accord Sanofi Aventis*, 58 F.4th at 704.

Second, PhRMA argues that the Act conflicts with the 340B program by "impermissibly expand[ing] manufacturers' obligations" by "forc[ing]" them to enter into more transactions at the 340B price than the federal law requires. (Doc. No. 31 at 21–22.) Many courts have rejected identical arguments. The Fifth Circuit, citing its own prior opinion, held that laws like Tennessee's Act "require manufacturers to provide discounted drugs to contract pharmacies 'only insofar as they have partnered with covered entities to distribute the drugs to patients.'" *Murrill*, 166 F.4th at 540–41 (quoting *Fitch*, 152 F.4th at 647). But "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts. Covered entities purchase and maintain title to the 340B-discounted drugs, while contract pharmacies dispense these drugs to covered entities' patients.'" *Id.* at 541 (quoting *McClain*, 95 F.4th at 1144). As in *Murrill* and *Fitch*, PhRMA's contrary characterization is "simply incorrect." *Id.* (quoting *Fitch*, 152 F.4th and 647).

Third, PhRMA argues that the Act "interferes" with the federal enforcement regime by prohibiting manufacturers from requiring 340B entities to submit claims data that, it claims, is necessary for detecting 340B abuses; limits manufacturers' federal right to conduct audits by expressly restricting the "frequency, duration, [and] scope of audits"; and restricts manufacturers' ability to request clarification of claims or to impose requirements related to credentialing. (Doc. No. 31 at 22 (citing Tenn. Code Ann. § 47-18-136(a)(1)–(2), (4)–(5)).) It asserts that, without

access to claims data, manufacturers cannot ask for audits and thus are precluded from accessing the "federal remedial regime." (*Id.* at 23.)

First, regarding credentialing, the plaintiff has not explained how this provision impacts any of its members or how it violates federal law. PhRMA both lacks standing to challenge that provision and fails to show how it is preempted.

Regarding claims data, as this court previously recognized, federal law does not expressly require covered entities to provide claims data, so a restriction on manufacturers' ability to require it does not conflict with federal law. *Accord AbbVie II*, 2026 WL 542712, at *11. Moreover, the Act expressly stipulates that manufacturers may not "requir[e] the submission of any . . . claims or utilization data . . . unless such data submission is explicitly required" by federal or state law. Tenn. Code Ann. § 47-18-136(a)(1). The state law, accordingly, is consistent with federal law, insofar as it simply prohibits manufacturers from requiring more data than is expressly required by federal law.

Similarly, the Act prohibits manufacturers from imposing across-the-board requirements relating to the "frequency, duration, or scope of audits" that are "not imposed on pharmacies or providers that are not 340B entities." Tenn. Code Ann. § 47-18-136(a)(4). On its face, this provision does not prohibit specific requests for audits under the 340B program. PhRMA does not plausibly allege that this requirement in any way interferes with its members' ability to request audits in accordance with the procedure established by the 340B regulations or to participate in the federal dispute resolution process. Moreover, as the State points out, "nothing in the [Tennessee Act] prevents federal regulators from gathering information, conducting audits, or meting out punishment." (Doc. No. 16 at 20 (citing *Johnson*, 102 F.4th at 456; *Sanofi Aventis*, 58 F.4th at 700–03).)

Finally, the plaintiff contends that the Act directly conflicts with the federal law, insofar as it attempts to "supplant the exclusive federal enforcement regime." (Doc. No. 31 at 26.) In particular, it points to the Attorney General's enforcement power, as well as the specter of criminal enforcement and private lawsuits—neither of which falls within the Attorney General's authority. (*See* Note 4, *supra*.) Regardless, the likelihood of criminal enforcement and private lawsuits under the Tennessee Consumer Protection Act is simply too remote to give rise to a plausible pre-enforcement claim. Regarding the Attorney General's civil enforcement authority, the Fifth Circuit has rejected this argument too, and the court adopts its reasoning as applied to the Tennessee statute:

> [The Act's] enforcement scheme does not conflict with Section 340B's enforcement scheme. It is true that Congress made HHS the sole enforcer of Section 340B. *See Astra*, 563 U.S. at 120. But [the Act] does not intrude upon this authority because it does not impose penalties for violations of Section 340B, like failing to offer discounted drugs to covered entities or engaging in diversion. Instead, it imposes penalties when drug manufacturers violate [the Act] by interfering with the distribution of Section 340B drugs pursuant to covered entities' partnerships with contract pharmacies. [The Act's] enforcement scheme therefore does not "concern[] the same subject matter" as Section 340B and cannot be said to conflict with it.

*Fitch*, 152 F.4th at 647–48. The plaintiff's argument that a conflict arises because state adjudicators might be required to apply and interpret federal law is simply a non-issue, both because the state enforcement scheme does not overlap the federal scheme, and because state adjudicators have always been called upon to address issues of federal law.[5]

---

[5] As just one recent example, the Minnesota Court of Appeals recently was called on to consider matters of federal law when addressing a challenge to Minnesota's analogous statute brought in state court, where that court held that the Minnesota law is not preempted by federal law and does not violate the dormant Commerce Clause. *See Pharm. Rsch. & Mfrs. of Am. v. Ellison*, No. A25-0805, 2026 WL 445719, at *8, 13 (Minn. Ct. App. Feb. 17, 2026)).

Accepting as true the plausible *factual* allegations in the Complaint, as distinct from legal arguments, the court finds, in sum, that PhRMA fails to allege facts that establish conflict preemption or field preemption.

2.      *The Dormant Commerce Clause*

The Constitution vests Congress with the power to "regulate Commerce . . . among the several States." Art. I, § 8, cl. 3. "Reading between the Constitution's lines," the Supreme Court has further held that the "Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Id.* at 368 (alterations in original) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). This "negative command" has become known as the dormant Commerce Clause. *Id.*

While the jurisprudence around the dormant Commerce Clause "developed gradually," its "core" focus is on prohibiting discrimination. *Id.* at 369. Specifically, the dormant Commerce Clause "prohibits the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* at 369 (some internal quotation marks omitted) (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 337–38 (2008)); *see also Truesdell v. Friedlander*, 80 F.4th 762, 764 (6th Cir. 2023) ("Under the modern approach to the dormant Commerce Clause, a law's validity largely depends on whether it discriminates against out-of-state businesses in favor of in-state ones."); *accord Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 486 (6th Cir. 2025) (recognizing this "antidiscrimination principle" as the "very core" of dormant Commerce Clause jurisprudence).

That principle was not at issue in *National Pork*. Instead, the petitioners expressly invoked the "extraterritoriality doctrine," arguing that the state statute they challenged violated the dormant Commerce Clause because it had the "practical effect of controlling commerce outside the State" and would "impose substantial new costs on out-of-state pork producers who wish to sell their products in California." *Nat'l Pork*, 598 U.S. at 371. The Court rejected the proposition that the law at issue was impermissible on that ground, noting first that the precedent on which the petitioners relied did not support it and further that, "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Id.* at 374.

To be sure, in a footnote, the Court left open the possibility that a law that "directly regulate[s] out-of-state transactions by those with no connection to the State" might violate the dormant Commerce Clause or some other constitutional limitation. *Id.* at 376 n. 1; *accord Flynt v. Bonta*, 131 F.4th 918, 929 (9th Cir. 2025) (quoting *Nat'l Pork*, 598 U.S. at 371), *cert. denied*, No. 25-173, 2026 WL 79841 (Jan. 12, 2026)). Thus, even following *National Pork*, courts have continued to hold that "a statute [that] has the specific extraterritorial effect of controlling the price of wholly out-of-state transactions" will violate the dormant Commerce Clause. *Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025). In addition, the dormant Commerce Clause bars "attempts to give local consumers an advantage over consumers in other States." *N.J. Staffing All. v. Fais*, 110 F.4th 201, 207 (3d Cir. 2024) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986)). Otherwise, however, "[e]ven when state law has significant extraterritorial effects, it passes [dormant] Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct." *Flynt*, 131 F.4th at 929 (alterations in original) (quoting *Chinatown Neighborhood Ass'n v. Harris*, 794

F.3d 1136, 1145 (9th Cir. 2015)); *see also Fais*, 110 F.4th at 205 ("Although several prior dormant Commerce Clause opinions focused on the extraterritorial effect of challenged laws, the Court explained that those cases were still animated by the antidiscrimination principle." (citing *Nat'l Pork*, 598 U.S. at 371)).

Accordingly, PhRMA's assertion that its allegations about the Act's "impact on non-resident manufacturers and out-of-state residents" are sufficient to state a dormant Commerce Clause claim is simply incorrect. PhRMA also alleges that the Act is discriminatory, insofar as it "privileges in-state participants in the 340B program by providing them monetary benefits not contemplated by Congress, while imposing a significant burden on out-of-state manufacturer participants in the 340B program." (*Id.* ¶ 154.) This is not the type of discrimination targeted by the dormant Commerce Clause, however. As the defendant argues, "there must be 'discrimination between similarly situated entities within and outside the state.'" (Doc. No. 16 at 25 (some internal quotation marks omitted) (quoting *Flynt*, 131 F.4th at 927).) In any event, in its Response to the Motion to Dismiss, PhRMA abandons any attempt to argue that the Act is discriminatory.

PhRMA instead argues that the Act "directly" regulates out-of-state conduct because it contains no express geographical restrictions on its definition of 340B entities or their "location" and that, on its face, the statute appears to govern the conduct of all drug manufacturers, wherever located, from "engaging in certain conduct vis-à-vis pharmacies and 340B entities," wherever located. (Doc. No. 31 at 30.) PhRMA asserts, "[b]y regulating commerce outside Tennessee, [the Act] violates the Constitution's ban on extraterritorial state regulation." (*Id.* at 31.) And it continues to argue that, at this stage, its allegations of the Act's "impact on non-resident manufacturers and out-of-state transactions" are sufficient to permit it to avoid dismissal of this claim. (*Id.*)

Again, this argument is unavailing. As stated above, "[e]ven when state law has significant extraterritorial effects, it passes [dormant] Commerce Clause muster when . . . those effects result from the regulation of in-state conduct." *Flynt*, 131 F.4th at 929. Moreover, the fact that the statute does not *specifically* limit its application to conduct occurring within Tennessee does not establish that it was intended to have extraterritorial reach or that the law "directly regulate[s] out-of-state transactions by those with no connection to the State." *Nat'l Pork*, 598 U.S. at 376 n. 1. The plaintiff's argument to the contrary disregards Tennessee's presumption against extraterritoriality.

As this court has previously explained, "Tennessee courts have repeatedly recognized the principle of extraterritoriality," pursuant to which courts presume that "[a] local statute has no extraterritorial force, and can be exercised only upon persons and property within the jurisdiction of the state where such statute is enacted[.]"*AbbVie I*, 2025 WL 1805271, at *23 (quoting *Renel v. Drexel Chem. Co.*, No. W2023-01693-COA-R3-CV, 2025 WL 1604377, at *4 (Tenn. Ct. App. June 6, 2025), *perm. app. granted*, No. W2023-01693-SC-R11-CV, 2025 WL 3442830 (Tenn. Nov. 25, 2025)). To rebut the presumption against extraterritorial application, "the statute at issue [must] contain a clear affirmative indication that it applies extraterritorially.'" *Id.* (quoting *Renel*, 2025 WL 1604377, at *8).

The Tennessee Act contains no affirmative indication of extraterritorial reach. Moreover, the Tennessee Consumer Protection Act—within which the Tennessee Act is codified—expressly provides that the purpose of Tennessee's consumer protection law is to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce *in part or wholly within this state*" and to "declare and to provide for civil legal means for maintaining ethical standards of dealing . . . to the end that good faith dealings between buyers and sellers at all levels of commerce be had *in this state*." Tenn.

Code Ann. § 47-18-102(2) & (4) (emphasis added). Based on this language and the absence of indication of a contrary intent, the court does not construe the statute to apply extraterritorially. To do otherwise "would contravene both Tennessee's presumption against extraterritoriality and the 'well established' canon of construction 'that statutes should be construed to avoid constitutional questions if such a construction is fairly possible.'" *AbbVie I*, 2025 WL 1805271, at *24 (quoting *Boos v. Barry*, 485 U.S. 312, 333 (1988)); *see also In re Schafer*, 689 F.3d at 605 ("Where, as here, a statute is challenged as unconstitutional, we construe the statute to avoid constitutional infirmity when fairly possible." (internal quotation marks and citation omitted)).

In short, the Complaint fails to plausibly allege that the Act violates the dormant Commerce Clause.

### 3. The Due Process Clause

Finally, PhRMA asserts that the Act is unconstitutionally vague. Although it raises other arguments in the Complaint, PhRMA's Response to the Motion to Dismiss argues only that the Act's "restriction on 'impos[ing] any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program,' is unconstitutionally vague." (Doc. No. 31 at 31 (quoting Tenn. Code Ann. § 47-18-136(a)(6)).) Its contention is based on the premise that the term "interfere" is not defined and that a "broad and undefined prohibition against 'interfer[ing]' with a 340B entity's access to discounts also fails to provide minimal enforcement guidelines" to the Attorney General. (Doc. No. 1 ¶ 165.) PhRMA contends that the absence of guidelines will "lead to inconsistent and discriminatory enforcement against manufacturers." (*Id.*; *see also id.* ¶ 162 ("[The Act] is insufficiently definite, and hands the Tennessee Attorney General virtually unlimited enforcement discretion against manufacturers.").)

Due process "bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning

and differ as to its application.'" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The Due Process Clause, however, does not require precision. *See United States v. Theunick*, 651 F.3d 578, 585 (6th Cir. 2011) ("[T]he practical necessities of discharging the business of government inevitably limit[] the specificity with which legislators can spell out prohibitions." (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952))). Thus, "no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines*, 342 U.S. at 340.

Applying this standard to subsection (a)(6) of the Act, this court has already determined that the "catch-all" provision is not unconstitutionally vague:

> Th[is] provision[], read in the context of the statute as a whole and considered from the perspective of a reasonable business person—and, more specifically, a reasonable drug manufacturer—provide[s] adequate notice of what conduct is prohibited and do[es] not invite arbitrary enforcement. The Act is targeted at precisely the conduct in which . . . drug manufacturers want to engage in order to limit the expansion of the 340B program. That is, the State seeks to ensure that drug manufacturers do not impose restrictions on covered entities' access to 340B discounted drugs that are not expressly authorized by federal law. . . .
>
> [O]rdinarily intelligent drug manufacturers would not need to guess at the meaning of the term "interfere" as used in subsection (a)(6). [Interference, as the term is commonly used, means] "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others." *Interference*, Black's Law Dictionary (11th ed. 2019). [The Act] thus prohibits manufacturers from "obstructing [the] normal operations" of, "or intervening or meddling in the affairs" of a contract pharmacy receiving and dispensing 340B drugs to 340B patients. . . .
>
> The statute plainly requires manufacturers to deliver 340B drugs to contract pharmacies and prohibits manufacturers from obstructing contract pharmacies in their dispensation of 340B drugs. The [c]ourt need not determine the precise contours of the statute in every hypothetical application because [the p]laintiff's "facial challenge may only be sustained if the enactment is impermissibly vague in all of its applications."

*AbbVie I*, 2025 WL 1805271, at *21–22 ( (internal quotation marks and citations omitted). The Constitution does not require precision, and the Tennessee courts are perfectly capable of assessing

whether particular conduct "interferes" with a 340B entity's access to the 340B program. Subsection (a)(6) is "'sufficiently clear so that a reasonable person can understand its meaning.'" *Platt v. Bd. of Comm'rs*, 894 F.3d 235, 247 (6th Cir. 2018) (quoting *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 798 (6th Cir. 2005) (en banc)).

## IV.    CONCLUSION

For the reasons set forth herein, the State's Motion to Dismiss under Rule 12(b)(6) will be granted, and the plaintiff's Motion for Preliminary Injunction will be denied as moot. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge